IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAY WINTON, on behalf of himself and all others similarly situated,<br><br>     *Plaintiff*,<br><br>     v.<br><br>SOUTHWEST AIRLINES CO., DELTA AIR LINES, INC., AMERICAN AIRLINES, INC., and UNITED AIRLINES, INC.<br><br>     *Defendants*. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jay Winton ("Plaintiff"), by his undersigned attorneys, brings this civil antitrust action, individually and on behalf of a class of all those similarly situated, for treble damages under the antitrust laws of the United States against Defendants Southwest Airlines Co. ("Southwest"), Delta Airlines, Inc. ("Delta"), American Airlines, Inc. ("American"), and United Airlines, Inc. ("United") (collectively, "Defendants"). This action arises from Defendants' conspiracy to fix, raise, maintain, or stabilize prices of airline tickets through a number of mechanisms, including, *inter alia*, signaling one another how quickly they would add new flights, routes, and extra seats in order to limit the capacity, and limiting access to competitive fare information to keep the price of airfares artificially high.

## THE PARTIES AND THE TRANSACTION

  1.  Plaintiff Jay Winton directly purchased tickets directly from Defendant Southwest. Plaintiff resides in University Park, MD. Plaintiff has flown Southwest

innumerable times including from Baltimore to San Antonio and to Nashville and many other destinations.

2. Defendant Southwest is a Texas corporation with its headquarters located in Dallas, Texas.

3. Defendant Delta is a Delaware corporation with its headquarters located in Atlanta, Georgia.

4. Defendant American is a Delaware corporation with its headquarters located in Fort Worth, Texas. It is a subsidiary of American Airlines Group Inc., also a Delaware Corporation with its headquarters located in Fort Worth, Texas.

5. Defendant United is a Delaware corporation with its headquarters located in Chicago, Illinois. It is a wholly-owned subsidiary of United Continental Holdings, Inc., a Delaware corporation with its headquarters located in Chicago, Illinois.

## JURISDICTION AND VENUE

6. Plaintiff's claim for injuries sustained by Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees.

7. This Court has original federal question jurisdiction over the Sherman Act claim asserted in this Court, pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

8. Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§15 and 22, and 28 U.S.C. §§1391(b), (c), and (d), because during the Class Period one or more of the Defendants resided, transacted business, were found, or had

agents in this district, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out in this district.

## BACKGROUND

9. This action challenges a collusion among major airlines to limit routes, information, and available seats to keep airfares artificially high. Plaintiff alleges that Defendants illegally signaled to one another how quickly they would add new flights, routes, and extra seats. To keep prices of airfares high, it was undesirable for Defendants to increase capacity.

10. On or around July 1, 2015, the Department of Justice confirmed that it was investigating potential unlawful coordination among the airlines. Department of Justice sent a letter to major U.S. carriers, demanding copies of all communications the airlines had with one another, Wall Street analysts, and major shareholders about their plans for passenger-carrying capacity, or "the undesirability of your company or any other airline increasing capacity."

11. Indeed, on July 1, 2015, Luke Punzenberger of United Airlines confirmed that the Department of Justice is investigating United.

12. From January 2010 to January 2014, capacity on domestic flights was virtually flat while the U.S. economy grew about 2.2 percent per year.

13. As a result of a series of mergers starting in 2008, Defendants now control more than 80 percent of the seats in the domestic travel market. During that period, they have eliminated unprofitable flights, filled a higher percentage of seats on planes and made a very public effort to slow growth in order to command higher airfares.

14. As graphically depicted below, the average domestic airfare rose 13 percent from 2009 to 2014, when adjusted for inflation, according to the Bureau of Transportation Statistics.

**National-Level Domestic Average Fare Series**

CSV | Table Version

NOTE: Click on an individual legend entry to turn off/on a line in the chart. Mouseover a line in the chart to see the exact value.



NOTE: Inflation-Adjusted air fares are calculated using dollars for the year of the most recent fare release.
SOURCE: Bureau of Transportation Statistics

15. In the past two years, U.S. airlines earned a combined $19.7 billion.

16. With suppression of routes, seats, and information, Defendants made higher profits, because at the same time there has been a massive drop in the price airlines pay for jet fuel - their single highest expense. In April 2015, U.S. airlines paid $1.94 per gallon, down 34 percent from the year before.



**Jet Fuel and Crude Oil Price ($/barrel)**

—Jet fuel price    —Crude oil price (Brent)

Source: Platts, Oanda, Digital Look

17.     In the absence of collusion, cost savings in airfares due to decreased jet fuel costs should occur.

<u>The Collusive Culture in the Airline Industry</u>

18.     The airline industry has a history of express coordinated behavior. For example, all airlines have complete, accurate, and real-time access to every detail of every airline's published fare structure on every route through the airline-owned Airline Tariff Publishing Company ("ATPCO"). The airlines use ATPCO to monitor and analyze each other's fares and fare changes and implement strategies designed to coordinate pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, the United States filed a lawsuit to stop several airlines from using their ATPCO filings as a signaling device to facilitate agreements on fares. That lawsuit resulted in a consent decree, now expired.

19.     Defendants have taken advantage of increasing consolidation to exercise "capacity discipline," which means restraining growth or reducing established service. In the

airline industry, recent experience has shown that capacity discipline has resulted in fewer flights and higher fares.

20.     In 2006, US Airways' CEO explained to investors that there is an "inextricable link" between removing seats and raising fares.

21.     Also, since 2008, the airline industry has increasingly charged consumers fees for services that were previously included in the price of a ticket. These so-called ancillary fees, including those for checked bags and flight changes, have become very profitable. In 2012 alone, airlines generated over $6 billion in fees for checked bags and flight changes. Even a small increase in these fees cost consumers in millions.

22.     The levels of the ancillary fees charged by the airlines have been largely set in lockstep. One airline acts as the "price leader," with others following soon after. Using this process, as a US Airways strategic plan observed, the airlines can raise their fees without suffering "market share impacts."

23.     For example, on May 21, 2008, Defendant American announced that it would charge for a first checked bag. On June 12, 2008, both United and US Airways followed American's lead. Similarly, over a period of just two weeks in spring of 2013, four airlines increased their ticket change fee for domestic travel from $150 to $200.

24.     At times, the airlines consider new fees or fee increases, but hold off implementing them while they wait to see if other airlines will move first. For example, on April 18, 2013, Defendant United announced that it was increasing its ticket change fee from $150 to $200. American decided that "waiting for [Delta] and then moving to match if [Delta] comes along" would be its best strategy. Over the next two weeks, US Airways, Delta, and American each fell in line, leading a US Airways executive to observe on May 1, 2013: "[American]

increased their change fees this morning.  The network carriers now have the same $200 domestic ... change fees."

The International Air Transport Association

25.     On June 11, 2015, the New York Times published an article titled "'Discipline' for Airlines, Pain for Fliers," in which one of Defendants' mechanisms for collusion was revealed, *i.e.*, industry conferences.

26.     Defendants reinforced their commitment to the collusion – which they referred to as "discipline" - through industry conferences, including the International Air Transport Association ("IATA") meetings.

27.     "Discipline" is a euphemism for limiting flights and seats for higher prices and greater profit margins.

28.     In June 2015, the world's top airline executives met at the annual IATA conference in Miami.

29.     At this meeting, Defendant Delta's president, Ed Bastian, stated that Delta was "continuing with the discipline that the market place is expecting."

30.     At this meeting, Air Canada's chief executive, Calin Rovinescu, stated, "People were undisciplined in the past, but they will be more disciplined this time."

31.     At this meeting, Defendant American's chief, Dough Parker, stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that," he told Reuters.

32.     This year, the "discipline" has been paying off; the IATA projected that airline industry profits would more than double in 2015 to nearly $30 billion – a record.

33. In May 2015, Defendant Southwest's chief executive, Gary C. Kelly, had considered breaking ranks and announced that Southwest was going to expand capacity in 2015 by as much as 8 percent, with the expansion spilling over into 2016.

34. However, after coming under fire at the IATA conference in June 2015, Mr. Kelly quickly changed his position, and stated "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."

35. The IATA meeting was an example of the industry conferences where Defendants agreed to restrict capacity increases to keep ticket prices high.

36. Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department, commented, "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity. And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

37. Peter Fitzpatrick, a spokesman for Air Canada, stated, "We are taking a disciplined approach to our business, not adding capacity in an attempt to simply expand market share but instead focusing on profitable growth."

38. In response to news of DOJ's CID's this week, Defendants have adopted a familiar defense. On July 6, 2015, Doug Parker, CEO of American Airlines stated that his "capacity" remarks were responsive to "a number of questions from investors, analysts and the media over the years about capacity." Continuing on that vein Parker added "but there is nothing illegal about that – indeed, transparency is rightly expected by all our external stakeholders."

39.     This all echoes of 2010 remarks by US Airways CEO in response to the "triple miles" program of a competitor. US Airways' CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and unfortunately everyone else's." US Airways' senior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. In that email thread, US Airways' CEO urged the other executives to "portray[] these guys as idiots to Wall Street and anyone else who'll listen." Ultimately, to make sure the message was received, US Airways' CEO forwarded the email chain – and its candid discussion about how aggressive competition would be bad for the industry – directly to the CEO of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)

## U.S. Senators' Call for Investigation

40.     In December 2014, U.S. Senator Charles Schumer (D-N.Y.) called for a federal investigation of U.S. airlines amid falling gas prices.

41.     Senator Schumer stated, "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. …. So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank."

42.     In mid-June 2015, U.S. Senator Richard Blumenthal (D-Conn.) asked the Department of Justice to immediately investigate collusion and anti-competitive behavior amongst U.S. airline companies following a meeting of top executives at the IATA annual conference.

43.     In his letter to Assistant Attorney General William Baer, Senator Blumenthal cited the Justice Department's investigation into the merger and the Department's initial complaint, which said, "The structure of the airline industry is already conducive to coordinated behavior … the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

Additional Findings about the Airline Industry

44.     On May 19, 2015, Professor Fiona Scott Morton of Yale School of Management and R. Craig Romaine and Spencer Graf of Charles River Associates published a study titled "Benefits of Preserving Consumers' Ability to Compare Airline Fares," which reveals the following information.

45.     Airlines' restrictions on access to airline information, *e.g.*, prices and schedules, substantially reduce consumer welfare. Potential reduction in net consumer welfare from limiting airline price and schedule information to only airline websites is estimated to exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.

46.     Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.

47. According to IATA's press release dated December 10, 2014, airline profits globally are at an all-time high and expected to reach $25 billion for 2015.

48. While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

49. For example, when Delta pulled its flights from three metasearch sites and American Airlines was absent on Orbitz and Expedia in early 2011, the Virgin Islands Tourism Department became concerned of an adverse impact on tourism. The sites "…represent a significant source of packages sold to the territory on these airlines…." According to January 10, 2011 article titled "American, Delta Pull Flights from Travel Websites" on Virgin Island Daily News, the Tourism Department responded by reaching out to media outlets to remind travelers of other ways they can book USVI trips on those airlines.

50. Search costs, and mechanisms to reduce them, are particularly important for air travel because airfares and schedules change frequently. Information becomes stale very quickly because a price that was available in the morning may be unavailable in the afternoon. This is due to the practice by airlines of "yield management" or "revenue management."

51. Yield management - pioneered by American Airlines in the 1980s - involves dynamically changing the availability of different prices for a particular flight according to demand in order to optimize revenue generated by the flight. In simplified form, airlines define many different fare "buckets" for each flight, where each bucket represents a different fare level and a different set of restrictions a traveler must meet to qualify for the fare. For example, one fare bucket may be for $109 but require a 21-day advance purchase and is available only for flights on certain less-popular days of the week. Another fare bucket may be $209 and require

14-day advance purchase. A seat on the same flight but in the first-class cabin with no advance purchase requirement and no blackout dates may be in a $1,700 fare bucket.

52. Generally, the fewer the restrictions on the ticket, the higher the fare. Because only so many seats are available on a given flight, the airline divides up into the different fare buckets in such a way to maximize the revenue of the flight. As the flight gets booked, some fare buckets will "fill up," and those fares are no longer available. Moreover, airlines analyze booking patterns in real time and dynamically adjust the number of seats available in each fare bucket. The end result is that, for a consumer searching for a flight, available airfares are literally changing in real time. Unlike other products for which prices change only infrequently, an airline traveler needs to refresh her price and schedule information on a frequent basis all the way up until the ticket is booked.

53. The airlines' actions have included the following:

- Prohibiting metasearch sites from referring consumers to an online travel agency ("OTA") for booking a flight.

- Prohibiting OTAs from providing airline information to metasearch sites.

- Prohibiting global distribution systems from providing airline price and schedule information to "unauthorized" metasearch sites.

- Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.

- Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

- Prohibiting metasearch sites from displaying price information of the airline.

54. As a result, some metasearch sites can no longer display prices and/or schedules of some major airlines in their search displays, depriving consumers of the benefits of transparent price comparisons.

55. For example, Delta has publicly cut off a number of different OTA and metasearch sites. In December 2010, Delta removed its flights from CheapOAir, BookIt.com, and OneTravel. Weeks later, in January 2011, Delta also cut off CheapAir.com, Vegas.com, AirGorilla, and Globester. By mid-2011, Delta had terminated its relationships with 21 OTAs.

56. More recently, in 2014, Delta has cut off a number of additional metasearch sites, including TripAdvisor, Fly.com, Hipmunk, and Routehappy. In early 2015, Delta cut off Skyscanner by preventing OTAs from distributing information related to Delta flights to Skyscanner.

57. Some airlines have indicated that an ultimate goal is to charge intermediaries for their data. For example, in 2009, Defendant American's then-CEO spoke of "…a day – and maybe I am dreaming here – where those folks who are the intermediary between us and our customers have to pay for access to our product rather than us paying them to distribute our product."

58. Shortly thereafter, Defendant Delta's CEO made reference to the same aspiration: "Over time, the industry has to evolve to more of the model of other industries where people pay us for our content rather than us paying them to take our content, because our content is very rich."

59. This statement confuses the issue: airlines are not in the product information or "content" provision business; rather, they sell transportation services. How much and what type of transportation consumers want to buy is a difficult and complex decision. Consumers need to have the information necessary to make that decision. Indeed, it is difficult to think of an industry that charges consumers for simply viewing their prices and product offerings.

60. In her study, Professor Scott Morton estimated that if fare-comparison sites do not have access to the biggest carriers' data, U.S. travelers would pay $6.7 billion more in airfare a year – equivalent to $30, or 11%, increase in the average fare.

61. Also, the strategy of restricting capacity is widely discussed among the large airlines and has been the subject of many recent statements by top airline executives. For example, the CEO of Defendant United told analysts and reporters that: "We're going to run the airline for profit maximization, and we're very focused on capacity discipline ... We will absolutely not lose our capacity discipline."

62. The CEO of Defendant Delta stated when discussing 2014 earnings that: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices... In fact, we continue to trim capacity on the margin to maintain yields and our RASM premium... You've got to run the company conservatively, and we're trimming capacity as we speak."

63. The CFO of Defendant American has similarly stated that it is not changing its capacity plans: "You won't see any changes from us in the near future."

64. When capacity is limited, airlines can fill the available seats at higher average prices. Fewer customers are served at higher prices, and overall consumer welfare is lower.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action as a class action under Rule 23(a), 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to certify a class action under federal antitrust laws on behalf of:

> All persons and entities who purchased a ticket directly from any
> of the Defendants (excluding any Defendants, their employees, and
> their respective parents, subsidiaries and affiliates) (the "Class")
> from January 1, 2010 to present (the "Class Period").

66. Due to the nature of the trade or the commerce involved, Plaintiff does not know the exact number of Class members involved, however, Plaintiff believes that Class members are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

67. Plaintiff is a member of the Class, Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and Class members purchased tickets from Defendants at artificially maintained, supra-competitive prices established by the actions of the Defendants in connection with the restraint of trade alleged herein. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Class.

68. Plaintiff is represented by counsel who are competent and experienced in the prosecution of complex class action litigation.

69. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

70. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability, damages, and restitution. Among the questions of law and fact common to the Class are:

    a. whether the Defendants and their co-conspirators colluded to fix, raise, maintain, and/or stabilize the airfares in the United States;

    b. whether Defendants violated Section 1 of the Sherman Act;

    c. the duration of the conspiracy alleged in this Complaint

    d. the nature and character of the acts performed by Defendants in furtherance of

the conspiracy.

71.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not individually afford to litigate an antitrust claim such as is asserted in this Complaint. This Class action likely presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily ascertainable.

### FIRST CAUSE OF ACTION
### (Violation of Sections 1 and 3 of the Sherman Act)

72.     Plaintiff realleges and incorporates by reference all the above allegations as if fully set forth herein.

73.     During Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating airfare competition in the United States.

74.     In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of airfares in the United States.

75.     As a result of Defendants' unlawful conduct, the airfares were raised, fixed, maintained and stabilized in the United States.

76.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants.

77. Defendants' conspiracy had the effect of artificially inflating the airfares charged in the United States.

78. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid more for airfares than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A. This action may proceed as a class action, with Plaintiff as the designated Class representative and his counsel as Class Counsel;

B. Defendants have engaged in combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C. Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

D. Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from: eliminating pricing data from OTA and metasearch websites and from continuing and maintaining the combination, conspiracy, or agreement to reduce capacity as alleged herein.

E. Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F. Plaintiff and members of the Class recover their costs of this suit, including

reasonable attorneys' fees as provided by law; and

  G. Plaintiff and members of the Class receive such other or further relief as may be just and proper.

  F. That this Court award all such other and further relief as it may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury of all issues triable by jury.

Dated: July 6, 2015

           LOWEY DANNENBERG COHEN & HART, P.C.

           /s/ Barbara J. Hart
           Barbara J. Hart (bhart@lowey.com)
           Christian Levis (clevis@lowey.com)
           Sung-Min Lee (slee@lowey.com)
           One North Broadway - Suite 509
           White Plains, NY  10601-2301
           Tel: (914) 997-0500
           Fax: (914) 997-0035
           *Attorneys for Plaintiff*